**SIGNED THIS: December 3, 2012**

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | |
| JOAN ALYCE EGIZII, | ) | Case No. 11-72838 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| ILLINOIS NATIONAL BANK, | ) | |
| a national banking association, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 12-7009 |
| | ) | |
| JOAN ALYCE EGIZII, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

Before the Court is Illinois National Bank's Second Amended Complaint Objecting to

–1–

Dischargeability of Debt, in which it alleges that Joan Alyce Egizii willfully and maliciously caused injury to its secured interest in her residence. As a result, Illinois National Bank asserts that it suffered damages which are nondischargeable. In her response, Mrs. Egizii claims to have been remodeling the residence and denies willfully and maliciously damaging the residence. After considering the evidence presented at trial and the arguments of the parties, the Court finds that Illinois National Bank has met its burden of proof and is entitled to the entry of a nondischargeable judgment in its favor and against Mrs. Egizii in the amount of $8172.59 plus costs of suit.

## FACTUAL & PROCEDURAL BACKGROUND

Joan Alyce Egizii ("Debtor") filed a voluntary chapter 7 petition on November 7, 2011. Several weeks earlier, Illinois National Bank ("INB") had filed a complaint against the Debtor in state court for breach of contract and to foreclose on a mortgage on the Debtor's residence at 2823 Dryden Drive, Springfield, Illinois. The foreclosure action was halted when the Debtor filed her bankruptcy.

The Debtor's relationship with INB began in December 2003 when she co-signed a note ("December 2003 commercial note") with her husband, Richard Egizii, payable to INB in the amount of $304,118.98. The December 2003 commercial note documented a refinance of an obligation previously entered into by Mr. Egizii with INB. The earlier obligation was secured by a mortgage in favor of INB on commercial property owned by Mr. Egizii's business, R.E.R.P., Inc., which was located at 1827-29 S. Ninth Street, Springfield, Illinois. The December 2003 commercial note was secured by both the commercial property and a mortgage on the Debtor's Dryden Drive residence. Subsequently, the Egiziis executed an Amendment to Note which extended the maturity date of the December 2003 commercial note to July 31, 2009. On September 29, 2009, the Egiziis executed a new note payable to INB in the amount of $230,927.32 ("September 2009 commercial

note"). The September 2009 commercial note was a refinancing of the December 2003 commercial note. On December 10, 2010, the Egiziis executed an Amendment to Note which extended the maturity date of the September 2009 commercial note to June 30, 2011.

Separately, in December 2009, the Debtor refinanced her original first mortgage on her Dryden Drive residence. At that time, she signed a note for $129,000 with INB ("December 2009 residential note") and executed an additional mortgage in favor of INB pledging her residence to secure this additional obligation.

According to the Debtor, the rental income from the tenant occupying the commercial property was sufficient to make both note payments to INB on a regular basis until March 2011 when the tenant defaulted. Without the rental income, neither the Debtor nor her husband were able to make the ongoing payments on the September 2009 commercial note, and INB filed the state court action in September 2011, seeking to foreclose on both the commercial property and the Dryden Drive residence.

After stay relief was granted by this Court, the foreclosure action was resumed and a Judgment of Foreclosure as to the Dryden Drive property was entered by the state court on March 16, 2012. In the Judgment, it was determined that $145,367.32 was due on the December 2009 residential note and, after giving credit for the proceeds from the sale of the commercial property, $173,322.36 remained due on the September 2009 commercial note. Because of the Debtor's bankruptcy discharge, no personal judgment was entered against her for these amounts, but a judgment was entered against her husband for the amounts due on the September 2009 commercial note. INB ultimately acquired title to the Dryden Drive property by being the successful bidder at a sheriff's sale of the property.

Prior to the sheriff's sale, however, INB obtained a temporary restraining order from the state court which prohibited the Debtor and her husband from removing, damaging, or disposing of any

of the improvements or fixtures at the Dryden Drive residence. The temporary restraining order also denied the Debtor the right to limit INB's access to the property. In obtaining the order, INB alleged that it had received information that the Debtor and her husband were removing fixtures and damaging the property.

On February 15, 2012, INB filed its Complaint Objecting to Dischargeability of Debt. INB alleged that the Debtor willfully and maliciously caused injury to INB's secured interest in the Debtor's residence by removing fixtures and damaging the property following the filing of the foreclosure suit. In its Second Amended Complaint Objecting to Dischargeability of Debt, INB made additional allegations of willful and malicious conduct by the Debtor. INB says that as a result of the Debtor's actions, it suffered $40,000 in damages which are nondischargeable. In her response to the Second Amended Complaint, the Debtor claims that she and her husband were merely repairing and remodeling the property and denies intentionally damaging the residence.

At the trial held on the Second Amended Complaint, the Debtor represented herself and testified in her own defense. The Debtor also called her husband, Richard Egizii, as a witness. INB called several witnesses: Rick Schramm, a senior vice-president of INB; James Moscardelli, who assisted the Egiziis in moving out of the residence; Robert Stowell, owner of Stowell Construction, who prepared a cost estimate for repairs at INB's request; James Stollis, who performed repair work for INB at the residence; and Brian Creasey, owner of BC Construction, who also made repairs at the residence on behalf of INB.

The collective testimony and exhibits presented at trial by INB established that the following items of property at Debtor's residence were removed, damaged, or destroyed by Debtor or her husband at some point between when INB filed its foreclosure suit and the time that the state court entered the order confirming the sale:

- Kitchen – The oven, refrigerator, and dishwasher were removed from the kitchen.

- Outdoor fence – The fence was removed by sawing off the fence posts at ground level. Part

of each of the fence posts remained embedded in concrete in the ground, which were later removed by James Stollis on INB's behalf.

- Back yard awning – The Debtor's residence had an awning attached to the back of the house that was gone by the time the temporary restraining order was entered. The awning's removal left holes in the siding.

- Crown molding and base boards – Crown molding and base boards throughout the house were removed.

- Flooring – Mr. Moscardelli testified that he witnessed Mr. Egizii removing hardwood flooring when he visited the Debtor's residence to give Mr. Egizii an estimate for moving costs. Mr. Egizii told him that the house was in foreclosure and that the Egiziis planned to leave the house a "shell."

- Windows – Numerous windows throughout the house were sealed shut.

- Staircases – The banisters and spindles on the staircases were removed.

- Mailbox – Mr. Schramm testified that the mailbox and supporting post were removed from the property after the state court entered the temporary restraining order.

- Hot tub – A hot tub on the deck at the back of the house was removed.

- Motorcycle lift – A motorcycle lift in the garage had been attached to the floor with eight bolts and was removed.

- Miscellaneous electrical items – Smoke detectors, light switches, and light switch plate covers were removed from various places in the house. A ceiling fan and light were missing from the "great room."

INB presented a construction bid dated August 21, 2012, from Stowell Construction and the testimony of Robert Stowell to establish that the cost of making all necessary repairs would be $42,227.91. INB presented evidence of the actual repair and replacement costs it incurred in the amount of $8172.59. Debtor did not deny the condition of the property or refute the testimony of

–5–

INB's witnesses regarding the missing fixtures and damage. Rather, both she and her husband testified that they were trying to fix up the residence but had been stopped in their efforts by the foreclosure.

One week after the trial, the Debtor filed a Motion to Dismiss, alleging that INB failed to prove its damages and again denying that she willfully and maliciously damaged the residence.

## JURISDICTION

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §1334. Objections to the dischargeability of a debt are core proceedings. *See* 28 U.S.C. §157(b)(2)(I).

## LEGAL ANALYSIS

To prevail on a §523(a)(6) claim, a creditor must establish (1) that the debtor caused an injury, (2) that the debtor's actions were willful, and (3) that the debtor acted maliciously. *First Bankers Trust Co. v. Dade* (*In re Dade*), 2012 WL 1556510, at *6 (Bankr. C.D. Ill. May 1, 2012); *see* 11 U.S.C. §523(a)(6). The creditor also must prove the amount of the debt that it alleges is nondischargeable. *See* 11 U.S.C. §523(a); *N.I.S. Corp. v. Hallahan* (*In re Hallahan*), 936 F.2d 1496, 1502 (7th Cir. 1991). The Supreme Court has held that "willful" refers to intent to cause injury, and not just the commission of an intentional act that leads to injury; reckless or negligent conduct is not "willful." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). At a minimum, a willful and malicious injury is one that the injurer caused knowing he had no legal justification to do so and desiring to cause the injury or knowing that the injury was highly likely to occur as a result of his act. *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012); *see also Nat'l Bank v. Buckley* (*In re Buckley*), 2009 WL 400628, at *2 (Bankr. C.D. Ill. Feb. 17, 2009). The creditor's burden of proof is to establish its cause of action by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

The Debtor caused injury to INB's property. Removing, damaging, converting, or misusing a creditor's collateral can support a finding of nondischargeability under §523(a)(6). *See Burdick v. Bryant* (*In re Bryant*), 2012 WL 2131947, at *4 (Bankr. C.D. Ill. June 12, 2012). In the case of conversion, the question is whether the debtor intended to improperly use the creditor's collateral or the proceeds therefrom for reasons other than the payment of the secured debt. *Heritage Bank of Cent. Ill. v. Vogel* (*In re Vogel*), 2005 WL 3506443, at *9 (Bankr. C.D. Ill. Dec. 12, 2005). As described above in detail, the undisputed testimony is that the Debtor and her husband removed from the residence numerous items, including kitchen appliances, flooring, staircase railings, the fence in the back yard, the mailbox, various electrical fixtures, and other personal property. The Debtor never replaced or accounted for these items. Furthermore, all of the damage and removal of property occurred while INB was in the process of foreclosing on the residence. The Debtor's actions in disposing of INB's collateral in this manner caused injury to INB's secured interest.

The evidence also clearly shows that the Debtor acted willfully. The Debtor claimed that the removal of the property from the residence was part of an ongoing remodeling project. The Debtor's testimony on this point was not credible for several reasons. First, according to the Debtor, the supposed remodeling began after INB sued the Debtor to foreclose on the residence. At that time, the Debtor and her husband were facing loss of the property and the prospect of a significant deficiency judgment related to the September 2009 commercial note. According to her own testimony, they were in financial distress and it is simply not believable that they would undertake an expensive remodeling project on a house they were unlikely to keep. Further, the removal of smoke detectors, light switches, staircase railings, and appliances, without ever replacing any of them, suggests that the Debtor was not remodeling the residence, but was rendering it uninhabitable. Additionally, Mr. Egizii told Mr. Moscardelli in February 2012 that the reason he was removing flooring from the house was that the property was in foreclosure and that he intended to leave the house a "shell." This evidence compels a finding that the Debtor intended to cause injury to INB's

interest in the residence.

The Court also finds that the Debtor's actions were malicious. The Debtor offered no legal justification for stripping the house and leaving it uninhabitable. The only inference to be drawn from Debtor's removal of fixtures from the residence during the time the foreclosure was pending up until the state court confirmed the sale of the property is that the Debtor intended to cause injury to INB's interest in the property. This suffices to establish that the Debtor acted maliciously within the meaning of §523(a)(6).

Finally, the Court heard testimony that Mr. Egizii removed some of the property from the residence, most notably hardwood flooring, while the Debtor was not present. Courts have held that the subjective intent required under §523(a)(6) cannot be imputed from one party to another. *See, e.g.*, *Furuto v. Lewenilovo* (*In re Lewenilovo*), 2012 WL 4468374, at *4 (Bankr. D. Haw. Sept. 25, 2012). That is, the creditor still must show that the debtor *herself* intended to cause injury. *See Diamond v. Vickery* (*In re Vickery*), 2011 WL 4963136, at *10 n.10 (Bankr. D. Colo. Oct. 17, 2011). The fact that the Debtor may not have participated in the physical removal of part or all of the property makes no difference in this case, however. As already explained, there is no question that the Debtor subjectively intended to cause injury to INB's interest in the residence. The Debtor admitted to being involved in removing property from the residence and directing what she unconvincingly characterized as a remodeling project. Additionally, the Debtor and Mr. Egizii were married at the time and the Debtor, by her own admission, was aware that Mr. Egizii was removing property from the residence. This is sufficient to establish that the Debtor intended to cause injury and that Mr. Egizii's conduct should be imputed to the Debtor for purposes of §523(a)(6). *See Bryant*, 2012 WL 2131947, at *4; *Mothershead v. Bacchus* (*In re Bacchus*), 2010 WL 3909697, at *4 (Bankr. M.D. Ga. Sept. 29, 2010).

As to the amount of damages INB suffered as a result of the Debtor's actions, no underlying state or federal court judgment exists regarding this issue. The Debtor has raised no objection to the

Court determining the amount owing to INB, so it is appropriate for this Court to resolve the issue. *See Hallahan*, 936 F.2d at 1508. When calculating compensatory damages, courts are entitled to make a reasonable estimate of the damages due, but such estimates must be consistent with the evidence presented. *See Horina v. City of Granite City, Ill.*, 538 F.3d 624, 637 (7th Cir. 2008). INB's evidence of its damages was sparse. INB presented testimony and a construction bid from Mr. Stowell estimating the cost of the repairs to be $42,227.91. Yet, INB presented no invoices or documents demonstrating its actual out-of-pocket expenses to repair the residence. The only evidence the Court received about INB's out-of-pocket damages was from the testimony of INB's witnesses. Similarly, there was no evidence of how the removal of property or damage to the residence impacted the value of the house itself.

Mr. Schramm testified that INB paid $1053.16 to purchase and replace various kitchen appliances. INB paid Ryan Electric $837 for electrical work at the residence and incurred $219 of expenses for lights, outlet covers, and related electrical items. Mr. Stollis testified that INB paid him $3000 to perform various repairs at the residence, including installation of appliances and removal of the buried fence posts that were left after the Egiziis sawed them off at ground level. INB also paid $55.02 for a new mailbox to replace the one that had been taken. Mr. Creasey, of BC Construction, said that he was paid a total of $2000 to make various repairs, which included replacement of base boards and flooring, repair of the staircases, and certain repairs on the deck at the back of the residence. INB also paid vendors directly for certain materials, including $964.90 for the staircase banisters and other supplies and $43.51 for trim.

Regarding the replacement of the fence in the back yard, Mr. Schramm testified that the bid from Stowell Construction included an estimate of $7352.35 to purchase and install a new fence. According to Mr. Schramm, the fence was never replaced and instead, INB discounted its asking price for the sale of the property. There was no evidence of the amount of the discount or that the absence of a fence reduced the property's value. Accordingly, no damages will be awarded on

–9–

account of the fence.

As for the awning and crown molding removed from the residence, Mr. Schramm testified that INB has not yet had these items replaced. There also was no evidence of how the absence of either impacted the value of the residence. With respect to the hot tub and motorcycle lift, INB also has not replaced those items and presented no evidence that their absence diminishes the value of the residence in any way. For these reasons, the Court also will award no damages to INB on account of the awning, crown molding, hot tub, or motorcycle lift.

Attorneys' fees involved in bringing a cause of action under §523(a)(6) can be found nondischargeable. *MCS Lasertec, Inc. v. Kaminski* (*In re Kaminski*), 2006 WL 2136010, at *2 (Bankr. N.D. Ind. July 27, 2006). But in this case, INB presented no evidence of its attorneys' fees, so none will be awarded or found nondischargeable. The Court will, however, award INB $293 in costs for the filing of this adversary proceeding.

The Debtor's Motion to Dismiss filed after the trial on INB's Second Amended Complaint raised no new legal or factual issues. Debtor's main complaint raised in the Motion to Dismiss is that INB failed to prove at trial the full $40,000 in damages it had originally claimed. The evidence on damages has been discussed above and the lack of evidence on some originally claimed elements of damage is a reason to limit the damage award but not a reason to dismiss the case. The Motion to Dismiss will be denied.

## CONCLUSION

The Court finds that based on INB's actual out-of-pocket expenses to repair and replace property at the Debtor's residence, INB is entitled to a judgment of $8172.59, which will be nondischargeable under §523(a)(6), plus its costs of suit in the amount of $293.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

See written Order.

###